Fadcliff, J.
This was the case of a policy on goods on board of the American brig, the Columbia, from New York to Amsterdam, with liberty to touch and trade at Hamburgh. The property was warranted to be American, or neutral. The vessel sailed from New York, and arrived at Cruxhaven, on her way to Hamburgh, and soon after sailed from thence for Amsterdam. She was captured, the day she sail-' ed, from Cruxhaven, by a British • sloop of war, carried to Yarmouth, and libelled in the English court of admiralty, and, with her cargo, was condemned for attempting to enter-a blockaded port. '
On the 21st of June, 1798, the date of the policy, neither party knew of the investment of Amsterdam; and this excludes the idea, that by any special agreement or understanding, the insurance could have been meant to extend to any peril, for breach of the particular blockade in question, if any existed.
1. It is a settled rule, that the insured, in order to comply *185 with his warranty, must not only maintain the property to be neutral, but so conduct himself, towards the belligerent parties, as not to forfeit his neutrality. He must pursue the conduct, and preserve the character, of a neutral. This being the import of the warranty, and the condemnation being founded on a breach of neutrality, it operates to preclude the plaintiffs, on the principles adopted with regard to the effect of foreign sentences, in the case of Vandenheuvel v. The United Insurance Company, from any recovery on the policy.(a)
2. In the present case, the plaintiffs, before the vessel sailed from New York, to wit, on the 27th of June, in consideration of law, had notice of the blockade. This appears by their letter to the defendant of that date. *A1 though the information was not then certain, it was sufficient to excite serious apprehensions, and to put them on their guard, which, in judgment of law, is deemed competent notice. (1 Atk. 490; 2 Fonb. 155.) The captain, however, before he sailed from Cruxhaven, had actual notice of the blockade; and there can be no doubt but the plaintiffs are liable for his acts. He sailed with the professed intent to evade it, if an opportunity should offer, but under an idea that, by the treaty of 1794, he was entitled to notice to desist, and to be sent back on the first attempt. The provision in the treaty, on this subject, it is obvious, cannot apply to a case, where the party already possesses the requisite information. This is the rule in all cases where the party is to be affected by notice.
But it is objected, that the captain was not in the act of breaking the blockade; that it existed merely in intention, and he was, therefore, not liable to seizure. If this idea be correct, then no such capture can be lawful, until the line of blockade be actually invaded. The resolution may be formed and acted upon ; and no progress in the execution of it can be stopped, or prevented, till the breach be made. A *186 construction so forcéd and limited, appears to me inconsistent with an effectual exercise of the right. It may be difficult to define its precise extent, but it is more reasonable to adopt the rule, that the besiegers are entitled to take preventive measures, and that when the resolution to break a blockade is formed and begun to be executed, within a reasonable distance, so as to render it practicable, the offence is incurred and the party liable to seizure. Such was the case in the present instance.
From the testimony of the mate, as well as from the sentence, it appears, that an actual blockade was understood, at the time, to exist. As a fact, it seems not to have been questioned. But the particular situation of *the blockading force does not appear, nor do I think it material. Although the party may have intended to avail himself of an accidental interruption, occasioned by winds or tempests, this intent will not excuse him ; for such interruption cannot be considered as destroying the existence- of the blockade. At least, if he attempts to enter, under such circumstances, it is at his peril, and he subjects himself to the hazard of seizure and confiscation. I think the reasoning of Sir William Scott, whose opinion is contained in the sentence, annexed to the case, is satisfactory, and that the sentence on tile merits was right; and, of course, that the plaintiffs, having forfeited their neutrality, ought not to recover, admitting the sentence to be open to investigation.
It may be proper to add, that the plaintiff here is not entitled to the premium, because the risk had actually commenced, and the warranty was forfeited by a subsequent breach of neutrality.
Kent, J.
On the facts in this case, two questions arise :
1. Will a voluntary attempt by the captain to break a blockade be sufficient to destroy the right of recovery on the policy ?
2. If it will, is there the requisite evidence in this case of that attempt 1
In answer to the first question, I am of opinion, that such *187 an attempt takes away from the assured his right to recover ; for he can never be allowed to indemnify himself upon an innocent party, from the consequences of his own want of skill, or from his negligence or folly. The act of the master must be referred.to his principal, who appoints him; and whenever a loss happens through the master’s fault, unless that fault amounts to barratry, the owner, and not the insurer, must bear it. It is a fault in the master, to occasion a loss of property, from *his carelessness or want of competent skill; and much more is it the case, if he wilfully occasion that loss, as by resisting search, breaking a blockade, &e. He is charged with a discreet and faithful execution of his trust, and it is against his duty to expose the property unnecessarily to risk, either from natural perils, or from perils arising from the violation of his neutrality. It is a point not to be disputed, that an attempt knowingly to break a blockade, is a violation of neutral duty, and occasions a forfeiture of the property ; and it cannot be supposed, unless it be so expressed, that the insurer takes upon himself such risk. The risk of fault in the master (barratry excepted) is not a risk enumerated in the policy; and it would be very unreasonable, that the insurer should be holden beyond his express undertaking, for the fault or folly of the master, whom the insured selects and controls. (Millar, 136-144, 179-188. 2 Valin, 77, 79, 161, 650,)
In answer to the second question, I have no doubt in concluding, that there is sufficient evidence in the case, of a wilful attempt by the captain to break the blockade of Amsterdam. This evidence results from the condemnation in the British court of admiralty; and for the conclusive effect of that sentence, 1 refer to my opinion in the cases of Vandenheuvel v. The United Insurance Company, and Vandenheuvel v. Church.(a) There is also sufficient evidence, without resorting to the sentence. When the captain left Oruxhaven, he sailed with the understanding that Amster *188 dam was a blockaded port; and'he sailed also under the idea, that if he should meet with a British cruiser in his at: tempt to enter Amsterdam, he would, for the first attempt, be sent back, and not seized. This appears by the testimony of the mate, and it is sulficient to establish the fact of the blockade, as against the plaintiffs, it being the admission of their agent, until they repel it by direct proof to the contrary. But there is no such contrary ^testimony in the case. It would seem, indeed, to be implied, from some of the observations of Sir William Scott, which are thrown into the case, that winds had occasionally blown of or kept at a distance, the blockading squadron: but at what precise time, or to what precise distance, does not appear. We do not know, except by necessary deduction from the testimony of the mate, what was the actual state of the blockade, or how far the British cruisers were at the time in a situation to preserve it. Nor do we know the situation the vessel was in, or her proximity to Amsterdam, when she was captured. The mate inform us only, that the master understood, when he sailed from Cruxhaven, that Amsterdam was blockaded ; that he sailed with an intent to attempt to enter it, and with the understanding that for his first attempt he would only be sent back, and that he was captured the day he sailed. How near he had approached the coast of the Ylie and Texel, we do not know. He might have reached the coast, for it is within the reach of a day’s sale. Every reasonable conclusion that the admissions of the mate will warrant, is, however, ,to be drawn against the plaintifis, so long as they furnish no other proof to repel those admissions. _
My opinion accordingly is, that the existence of the blockade, the wilful attempt of the master to break it, his capture while executing that attempt, and at no great distance from,' if not in the neighborhood of the blockading port, are all necessarily to be inferred from the case, and that judgment ought, therefore, to be given for the defendants.
Benson, J, was of the same opinion.
*189 Lewis, J. was.absent.
*Lansing, Ch. J.
I must differ in opinion from the rest of the court. The view in which I have considered this subject has led me to conclude, that the blockade, from the circumstances stated in the case, constituted one of those risks intended to be insured against by the policy, it not being in contemplation of the parties, at the time the insurance was made, to break the blockade; hence the blockade may well be taken as an event calculated to defeat the voyage, occurring since its commencement, and which would not justify the captain to divert his vessel from the port of destination, on the information that a blockade existed.
The British treaty provides, that a vessel which sails for a blockaded port, without knowing of the blockade, shall be turned away from such fort; but she shall not be detained, &c. unless, after notice, she shall again attempt to enter.
The expression appears to me only to apply to the inceftion of the voyage. The knowledge of blockade must exist before her leaving her port of departure. If acquired, in any stage of the voyage, after its commencement, the captain is not, in my opinion, obliged to take notice of it, before an attempt to enter.
The vessel’s touching at Cruxhaven was merely in the continuation of the voyage ; and hence she was entitled to prosecute her voyage, as if continued without touching at Cruxhaven; and if the British courts have considered the beginning of the voyage as from .Cruxhaven, so far as it respects the question between the parties, the ship was entitled to be turned away without seizure, and only subject to condemnation, in case of a second attempt, whatever might be the construction of the admiralty, on general principles, as applied to it.
The question is, was the voyage in its commencement, contrary to the law of nations 1 Was this an illegal * voyage ? The touching at Cruxhaven was provided for by the policy. It was a risk the insurer had *191 undertaken, and he must submit to the loss ; as in a case of a war breaking out in the course of a voyage.
Judgment for the defendants.(a)(b)

(a) See notes (b) to Vandenheuvel v. The United Ins. Co, supra, 144, 168 ; see also S. C. infra, 451.

(a) See notes (5) to Vandenheuvel v. The United Ins. Co. supra,144, 168,

(a) But see S. C. in the Court of Errors, 1 Caines’ Cas. in Err. vii.

(b) For the definitions of a blockade consult the opinion of Sir William Scott in The Vrow Judith, l Rob. 150 ; see The Byfield, 1 Edw. 188 ; also 1 Phill. on Ins. 393 ; and 1 Duer on Ins. 647, § 24. Mr. Duer’s definition seems on the whole to be the most accurate. See also 1 Kent’s Comm. 145 ; Bynkershoek, Q. J. Pub. b. 1, c. 4, § 11 ; Duponceau’s Trans. 82.
To make a blockade effective there should be a competent force to support it¡ Mr. King’s Letter to Lord Grenville, May 23d, 1799. Mr. Marshall’s Letter 0 Mr. King, Sept. 20th, 1799. Mr. Madison’s Letter to Mr. Pinckney,POct. 25th, 1801. Letter of the Secretary of the Navy to Commodore Preble, Feb. 4th, 1804. Mr. Pinckney’s Letter to Lord Wellesley, Jan. 14th, 1811. In the convention between Great Britain and Russia, on the 27th June, 1801, a blockaded port was declared'to be, “ that where there is, by the disposition of the power which attacks it with ships stationary, or sufficiently near, an evident danger in entering.” The definition in the treaty of commerce between the United States and Chili, in May, 1832, art. 15, and the Peru-Bolivian Confederation in May, 1838, art. 14, of a besieged or blockaded place, is, “ one actually attacked by a belligerent force, capable of preventing the entry of the neutral.” The Betsey, 1 Rob. 93; Williams v. Smith, 2 Caines, 1 ; Radcliff v. United Ins. Co. 7 Johns. 38 ; The Henrick and Maria, 1 Rob. 146; The Frederick Molke, 1 Rob. 86 ; The Mercurius, 1 Rob. 83 ; Journal of Congress, vol. 7, p. 241, Dec. 4th, 1781. 1 Kent’s Comm. 5th ed. 145; 1 Phill. on Ins. 393 ; 1 Duer on Ins. 648. But where such force is sufficient, a temporary removal of the blockading squadron by stress of weather, does not operate as a suspension ; The Frederick Molke, 1 Rob. 72 ; The Columbia, 1 Rob. 130; The Juffrow Maria Schroeder, 3 Rob. 155; The Hoffnung, 6 Rob. 116, 117; The Triheten, 6 Rob. 65 ; though it will excuse a neutral who is acting in good faith and without notice ; Radcliff v. The United Ins. Co. 7 Johns. 54; for breach of blockade is regarded as a criminal offence and the intention must concur with the act. See 1 Duer on Ins. 658, et seq. If however the removal be caused by the superior force of an enemy, Williams v. Smith, 2 Caines, 1; Letter of the Secretary of State to Mr. King, Sept. 20, 1799 ; The Triheten, ut sup.; The Hoffnung, id.; or if a part of the blockading force be ordered away on a different service, so that a competent force be not left to make the blockade effective ; The Nancy, 1 Act. Ap. Ca. 57 ; it is broken up. But the blockade is not relaxed, where some of the ships are employed in chasing suspicious vessels, that had approached the port, although their absence may leave some of the passes of communication unguarded and open; for the service in which these ships are engaged, is a necessary part of that to which they were appointed, and their absence, like that produced by a stress of weather, is justly regarded as accidental and temporary. The Eagle, 1 Act. Ap. Ca. 68. The blockade as far as pqssible must be preserved by the blockading forcé so as uniformity to exclude vessels, and therefore if it be relaxed and some vessels be permitted to pass, others have a right to infer that the blockade is raised. The Rolla, 6 Rob. 72; 1 Phill. on Ins. 393. The violation of a blockade being as before remarked, a criminal act, it must depend upon the intention of the party to commit the offence. Whether he had knowledge of the existence of the blockade is therefore an essential question in the consideration of this subject. Knowledge is either shown by direct or by presumptive evidence, and if by the latter the presumption may be either of fact or of law. Of the former it is not necessary to speak ; of the latter, however, it may be observed,
1. It is the better opinion that a notice of blockade by a blockading to a neutral state, will after a sufficient lapse of time for the latter to notify its citizens or subjects of the fact, be an absolute and irresistible presumption against them; 1 Duer on Ins. 658-660, 691-698 ; 1 Kent’s Comm. 5th ed. 147-151; opinion of Sir William Scott in The Neptunus Hempel, 2 Rob. 110; The Adelaide, id. 111, note ; The Vrow Johanna, id. 109 ; The Jonge Petronella, id. 131 ; The Nereide, 9 Cranch, 440. But this doctrine is assailejl by Mr. Wheaton in a note to the case of Olivera v. The Union Ins. Co. 3 Wheaton, 196, who argues that the government and courts of the United States have, among other doctrines, constantly maintained, that a mere notification to a neutral minister shall not be relied on as affecting with knowledge of the actual existence of the blockade, either his government or its citizens, arid that a vessel cleared or bound to a blockaded port shall not be considered as violating in any manner the blockade, unless on her approach towards such port, she shall have been previously warned not to enter it; in other words, that a neutral ship has in all cases the right to proceed to the very station of the blockading force, for the purpose ascertaining whether the blockade in fact exists, and is never guilty of an attempt to violate the blockade, unless she disregards the warning there received ; and cites the following authorities in support of his position. Williams v. Smith, 2 Caines, 1. Vos. v. United Ins. Co. 1 Caines’ Cas. in Error, vii. Liotard v. Graves, 3 N. Y. Term Rep. 226. Calhoun v. Ins. Co. of Pennsylvania, 1 Binn. 293. Fitzsimmons v. Newport Ins. Co. 4 Cranch, 185. Sperry v. Delaware Ins. Co. 2 Wash. C. C. R. 243. King v. Same, ibid. 300, and Radcliff v. United Ins. Co. 7 Johns. 38. Mr. Duer however, I Duer on Ins. 691, et sey. closely analyses these authorities and arrives at the conclusion stated above. Upon the 18th section of the treaty of 1794, between Great Britain and the United States, which is in the following words : “ And whereas it frequently happens, that vessels sail for a port or place belonging to an enemy, without knowing that the same is either besieged, blockaded, or invested, it,is agreed, that every vessel so circumstanced, may be turned away from such port or place, but she shall not be detained, nor her cargo, if not contraband, be confiscated, unless, after notice, she shall again attempt to enter, but she shall be permitted to go to any other port or place she may think proper;” he observes, “ The positions of the learned reporter will be found to derive as little support, from any decisions of the American courts, that are justly entitled to authority, as from the conduct of the American government. In the ease of Williams v. Smith, 3 Caines, 1, the blockade had in fact been raised a few days before *-he vessel arrived off the port, and the whole extent, of the decision was, that there must be an actual existing blockade to render it unlawful for the neutral to enter ; and for this construction of the general language of the court we have the positive authority of the same court in the subsequent ease of Radcliff v. United Ins. Co. 7 Johns. 55.” Upon the decision in the principal case in the Court of Errors, infra, 469 ; S. C. 2 Caines’ Cas. in Err. 7, and Liotard v. Graves, 3 Caines, 226, he remarks, 1 Duer on Ins. 696-698, n. “The decision in these, it cannot be denied, if admitted to be law, would sustain the doctrine of the learned reporter in its fullest extent. In the first of these the New York Court of Errors decided that a neutral ship, destined to a blockaded port, with an actual knowledge of the blockade, and an express intention to violate it, is not liable to capture during the voyage, on the ground that until her arrival at the very entrance of the blockaded port, there can be no attempt to violate the blockade, but a mere intention. To this reasoning a sufficient reply will be found in the text, and to admit its force, would be to contradict all the decisions both in England and in the United States, of the courts of common law, as well as of the admiralty, in which a voyage is held to be illegal at its commencement, by reason of the illegality of its ultimate purpose. As this decision of the Court of Errors was on a question that exclusively belongs to the law of nations, it is not to be considered as evidence, for reasons that have already been stated, of the existing law, even in the State of New York. The case of Liotard v. Graves is a mere reiteration of the doctrine in Vos v. The United Ins. Co., and was founded on the authority of that decision. It must therefore share its condemnation. It is unnecessary to detain the reader with any other further observations. It is certain that the only tribunal in the United States, that has the right to speak with authority on questions of this nature, the Supreme Court of the United-States, has never maintained any doctrine, at all, inconsistent with that of the English admiralty which I have adopted in the text; but that, on the contrary, its decisions, so far as they have gone, entirely coincide with those of Sir William Scott. I conclude with referring to the authority of Chancellor Kent, a reference which many readers may be disposed to think might supersede of itself the necessity of this long discussion. He expressly says, that a notice to a foreign government, is a notice to all the individuals of that nation, and they are not permitted to aver ignorance of it, because it is the duty of the neutral government to communicate the notice to their people ; and he admits the rule to be established, that where a neutral ship sails for a blocka? dedport with a knowledge of the blockade, actual or constructive, and ai) intention to violate it, the offence is so far complete as to authorize her unmedlr ate capture — and as evidence of the understanding of our own government ho refers to an ordinance of Congress of 1781, which goes to the full extent qf the English rule, by making it lawful to take and condemn all vessejs of ajl nations destined to a blockaded port. 1 Kent’s Com. 5th ed. p. 147 — 151.”
2. It is a presumption of law that the inhabitants of a blockaded por£ know the fact, and therefore the exit of a vessel with a cargo, shipped affer a blockade has commenced, unless it be so recent as to have been probably unknown when she sailed, is unanswerable evidence of an intention to violate it. The Frederick Molke, 1 Rob. 86. The Vrouw Judith, id. 150. The Adelaide, in notis, 2 Rob. 111. The Hare, 1 Act. Ap. Ca, 261.
3. Mr. Duer flunks that it may be safely assumed as the general rule, that the notoriety of the fact that a blockade exists at a port when a voyage is commenced, that a knowledge of the blockade would render illegal, will in all cases raise a presumption by which the party charged with the offence may be justly concluded. 1 Duer on Ins. 661, referring to the argument of Sir William Scott in The Adelaide, ut sup. and The Calypso, 2 Rob. 298.
As a general rule a blockade may be violated by an attempt to enter or go out from the blockaded port. The Frederick Molke, 1 Rob. 86. “ The attempt is, in the judgment of law, an actual breach. Nor in the application of this rule is the word ‘attempt’ to be understood in a literal or narrow sense. It is not confined to the conduct of the ship when she has reached the very mouth of the blockaded port, and only the act of entrance remains to complete the voyage. It embraces the whole voyage, when that voyage is begun with a knowledge of the blockade and an attempt to .violate it. The offence, in such cases, is complete from the moment that the vessel quits her port of departure ; and when the necessary knowledge is first imparted, during the voyage, its continued prosecution involves the crime and justifies its penalty. It is true, that the propriety of considering the entire voyage as a continued attempt to vio. late the blockade, has been strongly questioned ; but on examination, the doctrine will be found to rest on the firmest grounds of reason and authority. Were all vessels, destined to a blockaded port, permitted to approach the entrance of the harbor, so many would be enabled to enter, that the blockade would soon become ineffectual. Its main object, that of distressing the enemy by intercepting his necessary or usual supplies, would be defeated, and to prevent this, the rule that renders the vessels, so destined, liable to capture during the voyage, is indispensable. The same rule, we have already seen, prevails in all analogous cases without an exception. In all other eases where the ultimate purpose of the voyage is unlawful, it renders the voyage illegal at its inception; and the liability to seizure that there attaches, continues until the voyage is completed, or until the unlawful purpose has been abandoned, or its execution is no longer practicable. It would be a strange anomaly, if a voyage to a blockaded port, with the intent of breaking the blockade, were to be alone exempt from the application of this general rule, notwithstanding the contemplated act ¡s jegarded by all the writers on public law as the most noxious violation of neutral duty, and therefore fit to be restrained by the severest penalty. The objection that during the voyage there is no substantive offence, but a mere intention, that possibly may not be executed, and cannot, therefore, without a violation of principle, be justly treated as a crime, equally applies to all the cases where the illegality of the voyage arises solely from the illegality of its uncompleted purpose, and, in all, the reply that is given is equally conclusive. It is not a mere intention that the law punishes; but the commencement of the voyage is an overt act in execution of the unlawful intent; an act by which the execution of the intention is begun; and were the mere possibility that its execution may not be completed permitted to suspend the penalty, it could rarely or never be enforced, since this possibility exists until the unlawful design is fully accomplished, and the offender, in most cases, has been placed by its accomplishment beyond the reach of the law.” 1 Duer on Ins. 665, 666, and authorities. This rule does not apply where the vessel sails from a distant country with a clear intention to avoid the blockaded port, unless the blockade shall be raised. Id. 667-670. Any entry or attempt to enter by a neutral vessel, though only in ballast, is a breach of the blockade ; The Comet, 1 Ed. 32; but see 1 Duer on Ins. 672, n. (a) ; unless indeed it be enforced by a paramount necessity, as by the stress of weather ; The Fortuna, 5 Rob. 27 ; The Elizabeth, 1 Ed. Ad. De. 198; The Arthen, 1 id. 202 ; The Hurtige Hane, 2 Rob. 124; The Charlotta, 1 Edw. 252 ; but the egress of a neutral vessel, in ballast; The Comet, ut sup.; or with a cargo eta board clearly proved to have been purchased and delivered before tbe existence of the blockade was known, is not so. 1 Duer on Ins. 681, citing The Vrouw Judith, The Neptunus, The Byfield, ut sup. and The Calypso, 2 Rob. 298. See also, The Juno, id. 118; The Polsdam, 4 id. 189 ; Olden v. McChesney, 5 Serg. & Rawl. 271; Olivera v. The Unit. Ins. Co. ut sup. This whole subject is elaborately considered in the works of Mr. Duer, vol. l,p. 643-698 ; Mr. Phillips, vol 1, p. 392-400 ; Chancellor Kent, vol. 1, p. 143-152; and Mr. Wheaton on the Law of Nations, to which the reader is respectfully referred.