ALBANY,
August, 1811.

HALLET
v.
COL. INS. CO.

## HALLET *against* THE COLUMBIAN INSURANCE COMPANY.

*A. the owner of a vessel, by a charter-party, let the whole vessel to B. the master, for 4 months, and B. covenanted to victual and man the vessel at his own cost. Goods were shipped by different persons, for St. Thomas, but the master, instead of going to St. Thomas, went to Porto Rico, and there disposed of the cargo, and the vessel was sold. C. a shipper of goods, brought an action on a policy of insurance, for a total loss, by barratry of the master. It was held, that the master was owner pro hac vice, and though his conduct was in itself barratrous, yet being owner for the voyage, it did not amount to barratry; and the insurers were, therefore, not liable. The rule of law is general, and is applied as well to the innocent owner of goods, as to the owner of the ship, who consents to the fraud of the master.*

THIS was an action on a policy of insurance, on a cargo laden on board a vessel, called the *Cornelia*, on a voyage at and from *New-York* to *St. Thomas*. The policy was dated 20th *January*, 1807. The declaration was for a total loss, by *barratry* of the master. Plea *non assumpsit*.

The cause was tried at the *New-York* sittings, in *December*, 1810, before the *Chief Justice*.

The policy and interest of the plaintiff were admitted. From the testimony of the mate, it appeared that the vessel sailed from *New-York*, about the 19th *January*, 1807, on the voyage insured. They experienced bad weather, and were obliged to throw overboard some part of the cargo, being two casks of hardware, and one cask of nails, and some codfish and cheese. Having fallen to leeward of *St. Thomas*, the master, on coming off *St. Juan*, in the island of *Porto Rico*, declared his intention to put into that port, and accordingly went in there, on the 5th of *January*, 1807. The vessel might have easily beat up to *St. Thomas*, and would have probably reached that island the next day. The cargo which consisted of hardware and provisions, shipped by different persons, was landed, and was in good order; some repairs were made to the vessel, which did not cost more than 100 dollars; the cargo might easily have been carried to *St. Thomas;* the two islands being near each other, separated only by a narrow passage; and there was a daily intercourse between them by boats and vessels. The cargo was left at *St. Juan*, and the vessel was afterwards sold there, and *King*, the master, continued to have charge of her, and went in her a voyage to *St. Croix*, and from thence to *St. Thomas*, from whence she returned to *St. Juan*, and

afterwards, made several voyages between the *West-India* islands and the *Spanish Main*.

From the depositions of the consignees of the goods of the plaintiff, taken at *St. Thomas*, it appeared, that they received a letter from the plaintiff, dated the 15th *January*, 1807, mentioning that he should make a shipment to them by the *Cornelia*, to sail in five days, of about 200 barrels of flour, &c. but they heard nothing of the vessel, except from report, (which was, that the *Cornelia* had put into *St. Juan* in distress, and the vessel, after being surveyed, was condemned and sold, and purchased by the master and repaired) until she arrived at *St. Thomas* from *St. Croix*, in ballast, when the consignees applied to the master, and demanded the goods consigned to them by the plaintiff, and the master answered that the vessel during her voyage from *New-York*, was in such distress, that he had been obliged, for the preservation of the lives of himself and crew, to throw the goods overboard; the vessel left *St. Thomas* for *Curraçoa*.

The defendants produced in evidence a *charter party*, dated the 17th *December*, 1806, made between *Dunstan* and *Denniston Wood*, owners of the sloop *Cornelia*, and *William King*, master, by which the owners granted and let to freight the said vessel to the master, from the date, for and during such time as the master might choose to employ her, provided it should not exceed four months, for and at the rate of 153 dollars per month : and the owners covenanted to put the vessel in good repair, and keep her in repair, during the time she was employed by the master, at their own cost, and that the vessel should be at the risk of the owners, during all the time; and the master was allowed until the 7th *April*, 1807, to pay the hire of the vessel, unless she should, before that time, be delivered up to the owners, or lost. And in consideration of the premises, the master covenanted to take and employ the vessel on the terms mentioned, and to

ALBANY,
August, 1811.

HALLET
v.
Col. Ins. Co.

" victual and man her at his own cost and charges, until she should be delivered back to the owners, or be lost;" and that he would pay for the use of the said vessel, at the rate of 153 dollars per month, &c.

The judge charged the jury, that if they believed the conduct of the master amounted to *barratry*, and he thought it did, to find a verdict for the plaintiff for a total loss : and the jury found a verdict for the plaintiff, for a total loss.

A motion was made to set aside the verdict, and for a new trial.

*S. Jones*, jun, and *C. I. Bogert*, for the defendants, contended, that the master was owner of the vessel, *pro hac vice*, and, as such owner, could not commit *barratry*, which is an act committed by the master or mariners, for a fraudulent or unlawful purpose, contrary to their duty to their owners. Where there is an absolute letting to hire, and the hirer pays the master and crew, and has the complete control of the vessel, he is con-- sidered as owner, *pro hac vice*. In *M'Intyre* v. *Brown*,* the court considered these circumstances as decisive of the ownership for the voyage. If the same person be both owner and master, he cannot commit *barratry*. If the owner assents to the act of the master, it is not *barratry*;† and the shipper of the goods must resort to his action against the master or ship-owner for the fraud.

* 1 *Johns. Rep.* 229. *Cowp.* 143.

† *Marsh.* on *Ins.* 528. 1 *Term Rep.* 327. 3 *Caines,* 1. 4 *Term Rep.* 33.

*Wells*, contra, insisted, that the present case was dis- tinguishable from those which had been cited, and that the general rule about *barratry* was not applicable. The plaintiff is an innocent shipper of goods, and cannot be considered as consenting to the act of the master, nor ought he to be affected by his acts, or the conduct of the owner *pro hac vice*. Suppose the owner of the goods should assent to the *barratry*, and the owner of the vessel does not consent ; then the owner of the goods

might, *nevertheless*, recover for the *barratry*, if it is to be considered as an act done against the owner of the vessel only.

The true principle is, that a party cannot recover on the ground of an act of *barratry*, to which he has consented; but if committed without his consent, he may recover. *Millar*,* in his *Treatise on Insurance*, vindicates this distinction, though it must be admitted that the decisions in the *English* courts are against it. But in *Kendrick* v. *Delafield*,† the present *Chief Justice* seemed to think it a question still undecided and open, whether *barratry*, with the concurrence of the owners of the vessel, would exempt the insurer of goods belonging to an innocent shipper. Should the question not be authoritatively settled, it will not be difficult to show that the reason of the rule that the owner of the ship cannot recover for *barratry* to which he has consented, does not apply to an innocent shipper of goods.

* *Millar on Ins.* 165. 167.

† *2 Caines,* 67. 73.

Though an ownership *pro hac vice*, is, in many cases, deemed equivalent to an absolute ownership; yet this doctrine ought to be laid down with this limitation, that he is to be considered owner, as far as the persons dealing with him know the nature of the ownership. It ought not to apply to an innocent shipper of goods, who is wholly ignorant of the nature of the ownership, or whether it is absolute or temporary. The plaintiff never heard of the charter party until it was produced at the trial. The owner of a ship ought not to be permitted to hold himself out as owner, and afterwards, by transferring the ship to the master for the voyage, avoid all responsibility as owner, and leave the shipper of goods to look to the master who may never return, or be insolvent. In that way, the owner of the vessel may concert with the master, to defraud the owner of the goods, by letting the vessel to the master, with a view to his committing *barratry*, or running away with the goods. The owner of the goods cannot recover against the insurer; and if

he sues the owner of the ship, he will answer that she was let to the master, who was owner *pro hac vice*, and is the only person responsible.

*Per Curiam.* The master of the vessel was to be considered as owner *pro hac vice*, or for the voyage insured. There was a complete letting of the entire vessel for the voyage. The master was to victual and man her at his own cost. He had the whole management and control, and according to the principle established, or admitted, in the cases of *Velleijo* v. *Wheeler*, (*Cowp.* 142.) *M'Intyre* v. *Bowne*, (1 *Johns. Rep.* 229.) and *James* v. *Jones*, (3 *Esp. N. P.* 27.) the person having such an interest and authority in the ship, is regarded as the temporary owner. There is no doubt that the master's conduct was fraudulent and amounted to *barratry*, provided that *barratry* could be committed in the situation in which he stood. But it appears to be perfectly well settled, that if the master of the ship be at the same time the owner, he cannot commit *barratry*, because *barratry* can only be committed by the master or mariners in relation to the owner of the ship. He may, as owner of the ship, make himself liable, by his fraudulent conduct, to the owner of the goods, but not as for *barratry*. (*Lewin* v. *Suasso*, *Marsh.* 528. note. *Nutt* v. *Bordieu*, 1 *Term Rep.* 323.) It has been suggested that the reason of the rule is, that no man shall be allowed to derive a benefit from his own crime, which he would do were he to recover against the insurer for a loss occasioned by his own act; and that to make the reason of the rule apply, the master should have been owner of the goods. The answer to this is, that a rule of commercial law, when once settled, ought not to be disturbed, even though the reason of it may be justly questioned. Uniformity of decision is of more importance in such cases than accuracy of reasoning. That the insurer should be held responsible in any case to the owner, for the fraud

of the master, (who is the owner's agent,) has been deemed a strange and unreasonable part of the *English* law of insurance; (1 *Term Rep.* 330. 1 *Emerig.* 370. 2 *Johns. Cas.* 188.) and when we find such responsibility limited, as in this case, we ought not readily to extend it, merely for the sake of giving more consistency to the rule. As far as the authorities have carried the insurer's responsibility for *barratry*, so far we ought to go, but no further.

The motion, therefore, for a new trial ought to be granted, with costs, to abide the event.