# SUPREME COURT OF THE UNITED STATES.

SAMUEL S. THORP and others, owners of the schooner *Three Brothers*, agt. SAMUEL S. HAMMOND and seven others, owners of the schooner *R. H. Huntley*.

Where three vessels are close hauled and beating out a tack on courses which respectively carried them off shore about two miles, having the wind bearing off their port-bows respectively, the headmost schooner then went about and stood in shore on her starboard tack, the next, which was the libellant's vessel, also very soon after followed the former on the inshore tack, but before she could gather headway on the latter tack the hindmost of the three vessels on the off-shore tack, which was the respondent's vessel, ran into the second one head on striking her abaft the main rigging and causing her to sink in half to three-quarters of an hour, it appearing that the colliding vessel had no lookout on board, but had previously lowered her mainsail in order to take in reef, in which those on board of her were engaged at the time of the collision, and no one on board of her saw the libellant's vessel when she tacked or when she was in stays, or noticed her at all after her tacking until it was too late to avoid the collision. It was held that the collision was the result of gross carelessness in the management of the respondent's vessel.

It was the duty of the respondent's vessel, knowing as the master did that there were two schooners in close proximity to his own, knowing also as he must have known that they were beating out their tacks and would probably soon come about and put in shore, to keep watch of their movements and to notice the change of course of the second vessel in season to port his own helm and thus pass under the second vessels stern.

That the fact that the hands on the colliding vessel were engaged in reefing their mainsail did not relieve them from all obligation to observe the most common precautions against inflicting an injury upon a neighboring vessel ahead, especially when the movements of that vessel were precisely what ought to have been anticipated.

A custom of the sea not to have a lookout in the day time or while reefing is not a reasonable one, sufficient to justify the absence of a lookout in such a case as this.

It may be conceded that when two vessels are approaching each other, the one crippled, and the other in good manageable condition, it is the duty of the latter, if possible, to give way to the former.

When the owners of the injured vessel brought a libel in *personam* against the general owners of the colliding vessel, including the master of the latter who was also a general owner, but the evidence showed that the colliding vessel was commanded, sailed and exclusively managed by said master, under an arrange-

ment made between him and the other owners whereby he had in effect become the charterer of the vessel, to be employed on his own account without the management, control, restraint or possession of the other owners; the said master and part owner sailing the vessel on shares, hiring his own crew, paying and victualing them, paying half port charges. retaining half the net freight after the port charges were taken out, and paying to the general owners the other half: It was held that such master was the owner *pro hae vice*, and liable for said damages in the suit brought as aforesaid.

The master in question is the charterer of the vessel in question, and as such by the 5th section of the act of March 3, 1851, (9 *Statutes at Large, p.* 635), he is regarded as the owner and responsible for the tortious acts of the vessel.

Where the libel averred that all the respondent's were the owners at the time of the collision. but did not set out whether they were general or special owners, it was held that such averment was unnecessary, for it is immaterial to their liability whether they were one or the other if they had possession and control of the vessel. It is the ownership which determines the liability, and an averment of the mode in which ownership was acquired would be superfluous.

The fact that others who were the general owners of the colliding vessel are united as co-defendants with the owner *pro hae vice*, does not bar the libellant's right to recover against the latter. The libel is for a tort, and tort feasors are jointly and severally responsible.

The common law rule that where several are sued as joint tort feasors, there may be a recovery against one alone, against more than one or less than the whole number, applies also in admirality.

It is in accordance with admirality practice to decree against one of several respondent's to a libel for a tort, and to discharge the others.

On the point that though the master was under the arrangement aforesaid the special owner, yet the general owners were liable for the torts committed by the schooner while she was thus let to charterer, this court were evenly divided.

*Before Ch. J.* CHASE *and other justices, Justice* NELSON *absent.*

*November,* 1871.

THIS was an action in personam in admiralty to recover for damages sustained by the libellant's as owners of the schooner *Three Brothers,* which was sunk by a collision with the schooner *R. H. Huntley* off the coast of New Jersey on the 12th February, 1860.

The libellant's in their libel alleged as follows, viz: " That about 8 o'clock, A. M., of February, 12th, 1860, the *Brothers* had arrived within about eighteen miles of the Highlands of Neversink, on her voyage to the port of New York, and was running closehauled on a course off a little east of north, but a short distance from the shore. The *Huntley,* a smaller vessel and equally heavily laden, was running at the same

time, bound for the port of New York, in the same general direction, but a little further from the shore and in advance of the *Brothers*. A third schooner, the *William Capes*, heavily laden with wood was running in the same general direction, bound for the port of New York, and a quarter a mile ahead of the *Huntley*.

The said three schooners were sailing in that way from about 8 o'clock, A. M., until 9 o'clock, A. M., the wind being northwest and blowing freshly. That about 9 o'clock, A.M., the wind shifted more to the north, viz., N. N. W., and increasing in force; both the *Brothers* and the *Huntley* clewed down their foretopsails, and falling off a little from the land sailed on an offshore tack, a little to the east of their former course, on which they ran about two miles. Then the *Huntley* stood about and ran in for land. The *Brothers* in order to avoid a collision also stood about in for land; the *Huntley* at that time being about two hundred yards distant and passing the *Brothers* to the windward, when about a fourth of a mile from the shore both the *Huntley* and the *Brothers* went about to stand offshore; the *Huntley* began to lower and reef her mainsail; the *Brothers* passed the *Huntley* to the leeward under three full sails close to the wind. The *Brothers* proceeded on her offshore tack until she reached the heavy sea which was running about two miles from land, and she beat on her tack when she met the schooner *William Capes* who had just turned about from an off to an inshore tack, to avoid a collision with her and also the heavy sea and wind offshore, the *Brothers* also came about to stand in, at that time the *Huntley* was one point off the weather-quarter of the *Brothers*, and about six hundred yards astern of her. Immediately after the *Brothers* had come about and before she had gathered sufficient headway to be manageable, the *Huntley* going five knots an hour carelessly and wrongfully ran into the *Brothers* striking the latter on her larboard-quarter, about six feet forward of the cabin-house with such force that she sunk in about twenty

minutes, &c., &c.      *     *     *     *     *

During all that time, the *Huntley* was beating out her long offshore tack being one on which she was when the collision occurred, all hands on board of her were occupied in reefing the mainsail, and she had no one on the lookout from the lowering her mainsail until she ran into the *Brothers*, and the *Huntley* took no steps to avoid the *Brothers*, until the *Huntley* was directly upon her, and it was too late to keep off or come about. The collision occurred from the negligence of those on the *Huntley* in running directly towards the *Brothers*, instead of coming about or keeping off to avoid her, and in not seeing the *Brothers* long enough before the collision to allow her to come about or to keep off, and in not keeping a proper lookout, and in not having sufficient men on board to manage the said vessel safely and prudently. The owners of the *Huntley*, set up these defenses.

*1st.* That the parties sued as owners of the vessel, were in fact, only general owners of the said vessel, and that at the time of the collision the said vessel was commanded, sailed and exclusively managed by the respondent, Samuel S. Hammond, under and by virtue of an agreement made between him and the general owners to the effect, that he Hammond was to have entire control and management of the said schooner, as charterer on and for his own account by means of which he became and was the owner *pro hae vice* of said schooner at the time of the collision, and alone responsible for the consequences thereof.

*2d.* That the entire value of the *R. H. Huntley*, did not exceed $5,000, and her freight was $424, she was also damaged $350.

*3d.* On the merits, that the *Brothers* was in fault herself.

1. In not beating out her tack.

2. In improperly turning about when the *Capes* turned about whereby with a slight variation of her helm she could have easily passed under the stern of the *Capes*.

3. That when the *Brothers* turned about on the inshore

tack its direction was across the *Huntley's* bow, she knew full well that the *Huntley's* crew were engaged in reefing her mainsail by reason of which she was in a crippled condition, and the *Brothers* in utter disregard of the rights and condition of the *Huntley*, placed herself in such a position as to render a collision inevitable.

The cause was tried in 1863, before the Hon. W. D. SHIPMAN, the district judge of the district of Connecticut at that time holding the district court in New York, for his Honor the late Judge BETTS.

A great deal of testimony was taken and read on the trial, and the cause was argued on pleadings and proofs by Mr. E. C. Benedict for the libellant, and by Mr. R. H. Huntley for the respondents, Judge SHIPMAN dismissed the libel, with costs, and delivered the following opinion.

SHIPMAN, D. J.—The libellants, owners of the schooner, *Brothers*, have brough this suit in *"personam* against the respondents Samuel S. Hammond, Edmund Hammond, Jacob Smith, Charles Gillett, Bewster Terry, Charles Pim, Alfred Pim and Hiram Sell, owners of the schooner '*R. H. Huntley*,' to recover damages suffered by the former in a collision with the latter, off the Jersey shore, in February, 1860. The libel alleges unskillfulness and neglect in the management of the *Huntley* as the cause of the collision. Samuel S. Hammond the captain of the *Huntley*, was on board and had charge of her at the time of the collision. He was a part owner. I think it is shown by the proofs, that he had the exclusive possession and control of the *Huntley*, and that he manned, victualled and navigated her at his own expense. Such being the case, he must be deemed a charterer within the meaning of the act of congress approved March 3, 1851, which exempts the owners from personal liability and leaves the injured party to seek his remedy against the colliding vessel, and those who carelessly and unskillfully handled her. Samuel S. Hammond her captain is sued merely as a part

owner, and not as the charterer, wrong doer, or active cause of the disaster. His liability is placed by the libel on the same ground as that of the other owners, and the suit must, therefore, stand or fall as to all the respondents. I think, the statute a bar to the suit in this form.

Let a decree be entered accordingly, dismissing the libel, with costs."

From this decision appeal was taken to the circuit court, and was argued in May term, 1866, before Hon. SAMUEL NELSON, by Mr. R. D. Benedict, for the libellants, and by Mr. Huntley for the respondents. The learned circuit judge affirmed the decree below but delivered no opinion.

From the decision of the circuit judge appeal was taken to the supreme court of the United States.

The petition of appeal from the order of the circuit court affirming the order of the district court in favor of the respondents, was filed in June, 1867. Citation thereon was issued on the 19th June, 1867, returnable on the 1st monday of December, 1867, but was not marked filed by the clerk of the supreme court, nor docketed until December, 27th 1869, because a fee bond for the clerk's costs as required by rule 10 of the supreme court did not accompany the transcript, and there being no name of any counsel of the supreme court on the papers, the clerk could not find out to whom to give notice of the said omission. As soon as he ascertained the counsel's name, the clerk gave notice to him of the omission to file the said fee bond, whereupon such counsel caused the clerk's fee bond to be filed. The cause was not docketed until a subsequent term, but at the time of the argument had been on the calendar over two terms without any motion on the part of the appellee to dismiss.

R. H. HUNTLEY, *for the respondents.*

In the opening of the argument, took a preliminary objection, that the supreme court has no jurisdiction to entertain

this appeal, because the transcript of the record was not filed in this court at the term next succeeding the appeal.

The appeal was taken in June 1867, and the transcript of the record was filed in this court December 27th, 1869.

*Steamer Virginia* agt. *Wests, et al.*, (19 *How.*, 182). In that case it was held, that where appeal is taken to this court the transcript of the record must be filed, and the case docketed at the term next succeeding the appeal *Edmonson* agt. *Bloomshere* (7 *Wall.*, 306).

" Here it was held, that if it is apparent from the record, that this court has not acquired jurisdiction of a case for want of proper appeal or writ of error, it will be dismissed although neither party ask it, and that an appeal or writ ot error which does not bring to this court a transcript of the record, before the expiration of the term to which it is returnable is no longer a valid appeal or writ," that if no transcript is filed in this court at the term next succeeding the allowance of the appeal, it has lost its validity.

The same was held in the cases (*The Lucy*, 8 *Wall.*,307 ; *Villaboles* agt. *U. S.*, 6 *How.*, 81; *U. S.* agt. *Curry*, 6 *How.*, 106 ; *Mesa* agt. *U. S.*, 2 *Black*, 721 ; *Castro* agt. *U. S.*, 3 *Wall.*, 46).

Mr. McMahon, *for the libellants.*

In answer to this objection, argued.

A jursisdiction was acquired by this court by the return to the clerk of this court of the transcript duly certified within two days after the return day of the citation, and by leaving same with him.

(*a.*) The omission to give him his fee bond for his costs, as required by rule 10, was a mere practice matter.

(*b.*) The appellants gave the regular bond on appeal to stay execution below, but unfortunately from inadvertence neglected to give the clerk's bond for fees, under rule 10.

In *Seymour* agt. *Freer*, (5 *Wall.*, 822), it is held, that

where, through a mistake or accident no bond or a defective one has been filed, the court will not dismiss the appeal except on failure to comply with the order to give the proper security within a reasonable time.

(c.) This cause has been on the calendar for two years after such bond was given, yet the appelle has made no motion to dismiss the appeal.

In *Dillingham* agt. *Skein*, (*Hemp's Rep.*, 181,) it was held that the want of an appeal bond does not affect the jurisdiction; it is waived, if the party appear and do not object at the proper time.

(d.) Where no appeal bond was given on a motion to dismiss, time will be given to give security for costs (*Anson* agt. *Blue R. R.*, 23 *How.*, *p.* 1).

(e.) And a defective appeal bond may be supplied at any time before the case is finally acted on (*Deen* agt. *Hemphill*, *Hemp*, *p.* 181).

Now the present transcript handed to the court shows that it was filed on 27th December, 1869, yet in light of the above facts that is a clerical error, and this court could never see to correct it. In *Woodward* agt. *Brown*, (13 *Peters*, *p.* 1), it was held that a clerical error in the transcript of the record may be amended in the appellate court on the clerk's certificate without a *certiorari*.

A clerical mistake in the entry of judgment in error may also be amended, even at a subsequent term, the mandate not having been filed (*Bank of Kentucky* agt. *Wistar*, 3 *Peters*, *p.* 431).

This court have the power, for the purposes of exact justice, to direct their clerk to re-endorse the transcript of the record returned in this court as filed, of the exact time it was handed to the clerk, viz., December 9, 1867, which was in ample time.

The chief justice after consultation with his brethren directed the argument to proceed, saying that a portion of the court considered the objection under the facts presented

as untenable, and the other members of the court considered that the appellees had taken the objection at too late a period and thereby waived it. The argument then proceeded :

Mr. McMahon for the libellants and appellants on the points as to the liability of the general owners as defined by the local law of New York, wherein all the parties resided, cited and commented on the following cases, viz : *Saxton agt. Read, Lalor's Supplement to Hill & Denios, N. Y. Rep., p.* 323 ; *Kenzel agt. Kirk*, 37 *Barb., N. Y. Rep. p.* 113. Same case on appeal in New York court of appeals, and reported in 32 *Howard's N. Y. Prac. Reps., p.* 269 ; *McCready agt. Thorne*, 49 *Barb. N. Y. Reps. p.* 438 ; *Bassett agt. Crowell*, 3 *Robts. N. Y. Sup. Ct. Reps., p.* 72 ; *Vose agt. Cockroft*, 45 *Barb. Sup. Ct. Reps., p.* 58 ; *Sayer agt. Nichols*, 1 *Daly's N. Y. Com. Pleas Reps., p.* 1 ; *Kohler agt. Wright.* 7 *Bos. N. Y. Reps., p.* 318; *Sirns agt. Howard*, 40 *Maine*, 276. On the same liability as defined by the general admiralty law the counsel referred· to. 2 *Kent's Comt.* (6th ed.), p. 217; the *Volont*, 1 *Notes of Cases*, 508; the *Mary Caroline*, 3 *W. Rob.*, 106 ; 6 *Notes of cases*, 538, 539 ; *Scottin agt. Stanley*, 1 *Dallas*, 129 ; 8 *Wheat*, 632, 633 ; 8 *Cranch*, 39 ; *Act of Congress, March 3d*, 1851, *Secs.* 3 and 5, 9, *Stat. at Large, p.* 635; *Walker agt. Boston Ins. Co.*, 14 *Gray*, 288 ; *Allen agt. Mackay*, 6 *Law Rep.* 686 ; 1 *Sprague*, 219 ; *Spring agt. Haskel*, 14 *Gray, R.* 309 ; *Hill agt. The Golden Gate*, 5 *Am. L. R.*, 142, 146, 147 ; *S. C.*, 1 *Newberry's Adm. R.*, 308; *The Vrow Judith Volkritz*, 1 *C. Rob.*, 151 ; *U. S. agt. The Malek Adhel*, 2 *How. U. S., C. R. p.* 234 ; *The Columbia Meeks, Ibid.*, 156 ; *The Druid Norton*, 1 *W. Rob.* 399 ; *Story on Part, sec.* 440.)

On the liability of joint tort feasors, both in admiralty and at common law (*Low agt. Mumford*, 14 *Johns.*, 426 ; *Ruitgen agt. Kanouse*, 1 *Wash. C. C. R.* 168 ; *Milne agt. Hecker*, 3 *McLean*, 212 ; *Conner agt. Cockerill*, 4 *Cranch, Cir. Ct. R.*, 3 ; *Newell agt. Norton*, 3 *Wall.*, 266 ; *Smith*

agt. *Creole & Sampson,* 2 *Wall Jr. Ct. R.,* 485 ; *Chace* agt. *Crary,* 24 *How. N. Y. Pr. Rep.,* 159.)

On the general merits of the case Mr. McMahon cited and commented on (*Whittridge* agt. *Dill,* 23 *How. Rep.* 448 ; *The Catherine* agt. *Dickinson,* 17 *How.,* 170.)

Mr. Huntley on the liability of the general owners cited and commented on (*Lyman* agt. *Redman,* 23 *Maine,* 289 ; *Hallet* agt. *Columbian, Ins. Co.,* 8 *Johns.,* 272 ; *Clendaniel* agt. *Tuckerman,* 17 *Barb.,* 184 ; *Tuckerman* agt. *Brown,* 17 *Barb.,* 191 ; *Mc Cabe,* agt. *Doe,* 2 *E. D. Smith,* 64 ; *Sherman,* agt. *Fream,* 30 *Barb.,* 481 ; *Baker* agt. *Huckins,* 5 *Gray, Mass.,* 596 ; *Sproat* agt. *Donnell,* 26 *Maine,* 186 ; *Mantor* agt. *Holmes,* 10 *Metcalfe,* 402 ; *Naslin Parker,* 38 *Maine* 489 ; *Lincoln* agt. *Wright,* 23 *Penna, State R. p.* 76 ; *Webb* agt. *Pierce,* 1 *Curtis, C. C. R.,* 104 ; *Thomas* agt. *Osborne,* 19 *How.,* 22.*]*

On the general merits of the collision, Mr. Huntley cited and commented on the (*Osprey,* 1 *Sprague,* 245, 255 ; *Steamer Oregon* agt. *Reed,* 18 *How.,* 570; *The Pacific,* 1 *Newberry Admy.,* 29 ; *The Clermont,* 2 *Curtis, C. C.,* 363; *Clapp* agt. *Young,* 1 *Sprague,* 40, 44 ; *Steamtug Wm., Young, Olcott,* 41, 42 ; *Steamferry,* 181, *Relief,* 107 ; *The Columbus, Abb. Adm.,* 388 ; *The Brig Emily Olcott,* 132 ; *affirmed,* 1 *Blatch.,* 236 ; 1 *Parsons, Maritime Law.,* 191, 192 ; *The Steamboat Anglo Norman,* 1 *Newberry Ad.* 494 ; *The Bellville Id.,* 500; *Steamboat New York* agt. *Rea,* 18 *How.,* 223, 224 ; *Norbell* agt. *Steamboat, Keystone State,* 9 *N. Y. Leg. Obs.,* 289.)

*By the court,* STRONG, J.—This was a case of collision on which the libellants impleaded the respondents personally as owners of the schooner *R. H. Huntley.* The libel averred that on the 12th day of February, 1860, the schooner *Brothers* owned by the libellants, was negligently run into and sunk on the high seas, by the *R. H. Huntley* in consequence of the

mismanagement of those on board the *Huntley*, and in charge of her.

The manner in which the collision occurred as we gather from the evidence, was as follows. On the morning of the day above mentioned, three schooners, the *William Capes*, the *Brothers*, and the *R. H. Huntley*, all bound for New York, were proceeding up the New Jersey coast, not far below Sandy Hook. They were all heavily laden, and sailing close-hauled, having the wind about north northwest blowing fresh and fitfully. The general direction of their courses was about the same. The vessels were near each other, the *Capes* in advance and the *Huntley* next. After sailing thus from eight in the morning until after nine, the wind having veered more northwardly, all the schooners tacked toward the northeast, thus standing off shore.

When the *Huntley* tacked to stand out, she lowered her mainsail in order to take in reefs, but the *Capes* and the *Brothers* continued to carry the same sail they had carried before. In consequence of this, the *Brothers* passed the *Huntley*, though on the leeward side running at the speed of seven or eight knots, while the speed of the *Huntley* was only four or five. All the vessels ran on the off shore tack some fifteen or twenty minutes, which carried them about two miles out to sea. The *Capes* then went about and stood in shore on her starboard tack, the *Brothers* following very soon after, but before the latter could gather headway, after tacking, the *Huntley* ran into her head on striking her abaft the main rigging, and causing her to sink in half or three quarters of an hour.

All the witnesses agree, that when the *Brothers* tacked to stand in shore the *Huntley* was astern, though they differ respecting the distance at which she was astern. The evidence, however satisfactorily establishes that it was not less than five or six hundred yards, the *Huntley* being slightly to the windward.

It is also clearly proved, that there was no lookout on the

*Huntley,* that no one on board of her saw the *Brothers* when she tacked or when she was in stays, or noticed her at all after her tacking until it was too late to avoid the collision.

Though hailed from the *Brothers,* and told to keep off, no attention was given to the hail. The evidence also leaves no doubt, that had those in charge of the *Huntley* been watchful, had they seen the *Brothers* when she went about, it would have been entirely in their power by porting their helm to pass under the *Brother's* stern.

It is plain, therefore, that the collision was the result of gross carelessness in the management of the *Huntley.* Knowing as the master did, that there were two schooners in close proximity to his own, knowing also as he must have known, that they were beating out their tacks, and would probably soon come about and put in shore, there can be no excuse for his failure to keep watch of their movements and to notice the change of course by the *Brothers* in season to port his helm and thus pass under her stern. That the hands on the *Huntley,* were engaged in reefing the mainsail, certainly did not relieve her from all obligation to observe the commonest precautions against inflicting an injury upon a neighboring vessel ahead, especially when the movements of that vessel were precisely what ought to have been anticipated.

The respondents, however insist, that it is a custom of the sea not to have a lookout in the day time, or while reefing, and they have produced witnesses to prove such a custom. But the evidence falls far short of showing that such a custom exists generally, and if it were proved, it would not be a reasonable one sufficient to justify the absence of a lookout in such a case as this when the *Huntley* was in close proximity to two other vessels, both beating to the windward, and one of them at least expected soon to cross her bow. It has not been claimed, that the collision was the result of inevitable accident without fault, but the respondents contend, that it was due to the mismanagement

of the *Brothers* rather than to that of the *Huntley*. Their argument is, that the *Brothers* was under full sail and perfectly controllable while the *Huntley* being under head sails only with her hands engaged in reefing, was a crippled vessel and therefore, one to be favored. Hence it is inferred, that it was the duty of the *Brothers* to keep out of the way. It may be conceded, that when two vessels are approaching each other, the one crippled and the other in good manageable condition, it is the duty of the latter if possible to give way to the former. But the *Huntley* can in no sense be said to have been a crippled vessel. She was running freely on her off shore tack, four or five knots an hour, with her foresail and jib set. She obeyed her helm perfectly, and though she may not have been able to come about as easily as she would had her mainsail been set, there was not the slightest difficulty in the way of her taking care of herself, and avoiding collision with other vessels. The most obvious manœuvre that of porting her helm was not embarrassed at all by the fact, that her mainsail was not spread. It is further urged, that the *Brothers* had not beaten out her tack when she came about, and hence, that her putting her helm down, and turning inshore, when she did, was a fault which by throwing her in the way of the *Huntley*, caused the disaster. Was it, however, a fault? It is by no means clear from the evidence, that the *Brothers* had not beaten out her tack fully. On the contrary, the evidence that she had, appears to us to preponderate. But whether she had or not it is fully proved, that her coming about when she did was rendered proper if not necessary, by the fact, that the *Capes* changed to the starboard tack. The *Capes* was the leading vessel and while it is possible, that the *Brothers* might have ported her helm and gone astern of her, it is obvious, that the safer course was to tack when the *Capes* tacked, and there was no reason to apprehend, that the *Huntley* following astern at the distance of five or six hundred yards, and very little if at all the windward would be embarrassed by her tacking. She had

passed the *Huntley* close on the latter's lee side at a distance of not more than one hundred yards and the *Huntley* carrying on her foresail and jib had been constantly falling off to the leeward. Abundant sea room was, therefore, left for the following vessel. It required only, that the *Huntley's* helm should be ported half a point to carry her safely past the *Brothers.* We think, therefore, the whole fault of the collision is justly chargeable to the *Huntley.* It remains to inquire whether the respondents or any of them are personally responsible for the injury. They were all general owners of the schooner at fault at the time when the collision occurred, but the evidence shows, that she was commanded sailed and exclusively managed by Samuel S. Hammond one of them under an arrangement made between him and the other owners whereby he had in effect become the charterer of the vessel to be employed on his own account without the management, control, restraint or possession of the other owners. He sailed the vessel on shares, hiring his own crew, paying and victualling them, paying half the port charges, retaining half the net freight after the port charges were taken out and paying to the general owners the other half. It is clear, therefore, that he must be considered as having been the owner *pro hac vice.* This accords with the authorities generally (*Hallett* agt. *The Columbian Ins. Co.,* 8 *Johns.,* 272 ; *Webb* agt. *Pierce,* 1 *Curtis C. C.,* 104 ; *Thomas* agt. *Osborne,* 19 *How.,* 22 ; *See also, act of Congress of March* 3, 1851, *sec.* 5, 9, *Stat. at Large,* 636.) Notwithstanding this, however, and though Samuel S. Hammond was the special owner, it has been contended on behalf of the libellants, that all the general owners are liable for the torts committed by the schooner while she was thus let to charter. The circuit court was of opinion, that they are not, and this court is equally divdied upon the question. But we are all of opinion, that the owner *pro hac vice* is liable, and that he may be charged in this proceeding. The court below held, that he had been sued merely as a

part owner not as the charterer, wrong doer or active cause of the disaster, and that as his liability was placed by libel on the same ground as that of the other owners, the suit must stand or fall as to all the respondents, and they held the act of March 3, 1851, a bar to the suit in the form in which it had been brought. The court, therefore, dismissed the libel. This, we think, was an error. The act of 1851, enacts, that the charterer or charterers of any ship or vessel in case he or they shall man, victual and navigate such vessel, at his or their own expense, or by his or their own procurement, shall be deemed the owner or owners of such vessel within the meaning of the act (*sec* 5.) The previous section had declared, what shall be the liability of owners for collisions. Samuel S. Hammond, therefore, is to be regarded as the owner, because the charterer and as such responsible for the tortious acts of the vessel. If the other general owners are not, he is, the libel, it is true, avers, that all the respondents were owners at the time of the collision.

It does not set forth, whether they were general or special owners, such an averment was unnecessary, for it is immaterial to their liability whether they were one or the other, if they had the possession and control of the vessel. It is the ownership which determines the liability and an averment of the mode in which ownership was acquired, would be superfluous. Had Samuel S. Hammond been sued alone as he might have been, the libel need not have averred more respecting his ownership than is averred now. It would have been of no importance to set out whether he became owner by purchase of the schooner or by bequest, or by charter party, for his liability would have been as fixed in such case as in the others, nor does the libel in this case charge general ownership as distinguished from ownership *pro hac vice*, or ownership as defined by the statute. There is nothing then in the structure of the libel which stands in the way of a recovery against Samuel S. Hammond as owner,

unless it be that others are also sued with him.    And surely that is no bar to a recovery against him.    The libel is for a tort, and tort feasors are jointly and severally responsible. At common law, when several are sued, there may be a recovery against one alone or against more than one and less than the whole number.    We know of no reason for a different rule in admiralty, and it is in accordance with admiralty practice to decree against one or several respondents to a libel for a tort, and to discharge the others (*Newell* agt. *Norton and Ship*, 3 *Wall.*, 257 ; *Smith* agt. *The Crede and Sampson*, 2 *Wall.*, *C. C.*, 485).

Our opinion, therefore is, that even if the libel was rightly dismissed as to all the respondents except Samuel S. Hammond, the libellants are entitled to a decree against him.

The decree of the circuit court is reversed, and the record is remitted with instructions to order a reference to ascertain the damages and to decree that the libellants recover against Samuel S. Hammond.