CLAPP (FORSYTH v.). See Case No. 4,949.

CLAPP (MASON v.). See Case No. 9,233.

CLAPP (WILSON PACKING CO. v.). See Cases Nos. 17,850 and 17,851.

## Case No. 2,786.

CLAPP v. YOUNG et al.

[1 Spr. 40;[1] 9 Hunt, Mer. Mag. 173; 6 Law Rep. 111.]

District Court, D. Massachusetts. Feb., 1843.

FRAUDULENT SALE — WHO MAY COMPLAIN—COLLISION—VESSEL AT ANCHOR—BURDEN OF PROOF.

1. The question whether the sale of a vessel was fraudulent as against creditors, can

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

not be raised by third persons, who have no interest in the question.

2. In cases of collision, where it appeared that one of the vessels had neglected an ordinary and proper measure of precaution, the burden was on her to show that the collision was not owing to her neglect.

[Cited in Bulloch v. The Lamar, Case No. 2,129: Martinez v. The Anglo Norman, Id. 9,174.]

3. The schooner Eddington went into Provincetown harbor in a gale of wind. After coming to anchor, she was driven from her moorings toward the flats, where she was brought up by her small anchor, and lay head to the wind. In this position, she was run foul of in the night time by another vessel, the Lion, having no person on board. *Held*, that the owners of the Lion had omitted a reasonable and ordinary measure of security, and that the collision was to be attributed to their neglect, notwithstanding a usage at Provincetown to leave vessels, owned in that place and manned by persons residing there, at anchor in the harbor, without any person on board.

In admiralty.

Benjamin R. Curtis, for libellant.

F. C. Loring and C. W. Loring, for respondents.

SPRAGUE, District Judge. This is a libel by the owner of a schooner called the Eddington against the owners of a schooner called Lion, for damage by collision. The first question is whether the libellant was owner of the Eddington. He has produced the usual muniments of title, a bill of sale, and an enrolment in his own name. It is insisted that the sale was without consideration, and for the purpose of defeating the creditors of Chandler Clapp, the former owner. But the respondents are not his creditors and are not in a position to raise that question. If Chandler Clapp chose to give the vessel to the libellant, it was no concern of the respondents; the sale would be good as to them as well as between the parties.

The next question is, whether there was any collision between those two vessels. On the morning of the third of October, 1841, the Eddington went into Provincetown harbor as a place of refuge, as a gale had then commenced. She came to anchor, but was subsequently driven from her moorings to the flats or near them, where she was brought up by her small anchor, and lay head to the wind. In this position she was run foul of in the night by some vessel having no person on board. Was that vessel the Lion? The master, mate, and a seaman by the name of Brennan testify that they were on board the Eddington and saw the vessel which came in contact with her, and when she was cleared from her, and kept sight of that vessel until she had drifted ashore; and the captain and Brennan testify that on the next day they went on board the same vessel, and that it was the Lion. They all three testify to certain distinctive marks of the vessel which came in collision with them, as to some of which they concur, and others are stated by one or two, but not by all.

And it is shown not only by the testimony of the captain and Brennan, but by Howard, the mate of the Lion, that these marks belonged to that vessel, and there is no proof that they belonged to any other; and they were such that it cannot be supposed that any other vessel would bear, some of them being descriptive of injuries received. The Lion is proved to have been a pink-sterned schooner of about sixty or seventy tons, which had previously during the same night drifted against the Tarquin, where she received considerable injury, and among other things, her larboard bulwarks were carried away, and her anchors were left, one on board, and the other under the Tarquin, both her cables having been cut by one of the crew of the latter vessel. The vessel which drifted against the Eddington came broadside on, the bowsprit of the Eddington going between her masts, and it is testified by one at least on board of the Eddington that her waist was cut down. Now it is testified by Howard, the mate of the Lion, that when he went on board of her the next day she had her bulwarks on both sides knocked down nearly to the mainmast, which is most satisfactorily accounted for; if, after the larboard bulwarks were carried away by the Tarquin, as testified by Jefferson, she drifted broadside upon the Eddington, and there carried away her starboard bulwarks. There were several other marks testified to by those on board the Eddington which it is not necessary to enumerate. It is sufficient to say that if they were in fact seen at the time of the collision they identify the Lion beyond any rational doubt. But it is insisted that such was the darkness of the night that it is impossible that those on board the Eddington should have seen what they testify they saw, or kept sight of the vessel until she reached the shore, nearly or quite half a mile distant. Six witnesses have been produced by the respondents, who testify strongly to this impossibility; while six other witnesses have been produced by the libellant, who testify that it was practicable to see as stated by those on board the Eddington. Now, it is to be observed, in the first place, that these last, three in number, testify affirmatively and positively that they did see certain things, and that of the six witnesses in behalf of the respondents, five were on land, while the other six witnesses produced by the libellant were on board six different vessels in the harbor, and testify that the foaming and combing of the sea was such that a person could see better on the water than on the land, and they state certain things which they themselves saw and did. We cannot be certain that those on shore speak of the same point of time as those on board the Eddington, and we may well suppose that there was some variation in the degrees of light and darkness during the night; and as the moon was only three days from the full, I do not think it is shown

to be incredible that the witnesses for the libellant should have seen what they affirm.

It is further contended that from the position of the two vessels and the direction of the wind it was impossible that they should have come together, and a number of witnesses have expressed this opinion. But it is to be observed,

1. That some of them, at least, seem to refer to the position of the Eddington the morning after the gale, which was a considerable distance, and by the plan offered by the respondents, nearly a quarter of a mile from the edge of the flats where the collision is alleged to have taken place.

2. Some if not all assume, that the Lion went in a straight line, by a "dead drift" as it was expressed, from the place of her moorings to the point where she was found after the gale, which is founded on the supposition that the wind was all the time in one direction, whereas Cowan, one of the witnesses for the respondent, testifies that the wind changed about eleven o'clock to the north, and other witnesses also speak of a change of the wind. Now it appears, that the Lion dragged her anchors from the place of her moorings until she came in contact with the Tarquin, when her cables were cut and her anchors left. As there was no one on board the Lion, we cannot know how long she was in drifting, how often she brought up while her anchors were ahead, or how near she may have been to the Tarquin when she last brought up. She remained in collision with the Tarquin about half an hour. I am not aware that the relative positions of the Tarquin and the Eddington have been stated, or that any witness has expressed an opinion that a vessel could not have been carried from the Tarquin to the Eddington. If the Tarquin was north of the Eddington and the Lion parted from the Tarquin after the wind had come to the north, as testified by Cowan, there would be no improbability in her striking the Eddington, and being afterward carried in a southerly direction to the point where she was found next morning.

3. Other witnesses who saw the position of the two vessels and had every opportunity to know the state of the wind, express the opinion that they did come in collision.

4. What other vessel could it have been that run foul of the Eddington? The captain of that vessel, before he left Provincetown, and soon after the occurrence, charged it upon the Lion, and said he should claim compensation. The attention of the respondents was early called to this subject; and yet in all their testimony they have presented but one ground of probability that it was some other vessel, and that is that other vessels were found after the gale lying nearer to the Eddington. It so happens that all those vessels, as appears by the testimony of Cowan, a witness for the respondents, who, from the proximity of his residence, seems to have had the best means of knowl-

edge, were strangers with their crews on board. The only two that are named are the Vestal and the Amanda. Martin Stoddard also testifies that the Vestal had a crew on board; and Charles Bruce testifies that he was on board the Amanda, that she came in collision with no other vessel, and that there was no vessel on shore nearer to the Eddington than the Lion, excepting his own. It also appears, that the Vestal had a square stern. It has already been stated that there was no person on board the vessel which came in contact with the Eddington; and the captain, mate and Brennan testify that she had a pink stern. It has been contended that these three witnesses are not entitled to belief. As to the captain, although his general character is shown to be good, yet from the character of the conveyance of the vessel to his brother, the libellant, and the bias that he may be under as master or agent of his brother, if indeed he have not a pecuniary interest, I think reliance should not be placed upon his testimony when in conflict with that of disinterested witnesses, or in matters of opinion.

But against the mate and Brennan no such objections exist. It is indeed suggested that the latter expects to go to sea again with the captain, but the mate was discharged immediately after a gale, for a cause, as appears by the log book, which would be far from conciliating his favor, and there is no reason to suppose that he has any partiality whatever, either for the captain or the libellant. On the whole, I do not think there is any substantial reason to doubt that it was the Lion which came in collision with the Eddington. It has been suggested that the Eddington was in fault in not having let go both anchors, in the first instance, and in keeping her yards and topmasts aloft. This, however, has not been much urged, and I do not think that the evidence shows it to be blameworthy.

The most important and the most difficult question still remains. Is the collision to be attributed to negligence on the part of the Lion? The only neglect alleged is the leaving her alone when it was seen that a gale was coming on, with from thirty to fifty vessels at anchor in the harbor. Notwithstanding the wide diversity of opinion among the witnesses, I am fully satisfied, from testimony, that a vessel is rendered more safe from collision by having some person on board. But this is by no means decisive; for it has been well contended by the counsel for the respondents that the owners were not bound to take extraordinary measures of precaution, however conducive to safety. The question is, whether they have omitted a reasonable and ordinary measure of security. Now I think it appears by various maritime codes, adopted by different nations, in different ages, to have been the opinion of those who have legislated upon the subject, that a vessel ought not to

be left without some person on board, and this is strongly indicative of the general sense of the maritime world. The evidence in this case, derived from numerous witnesses who have had much experience as mariners in all kinds of vessels, satisfactorily proves that, as a general rule, some person ought to be left on board a vessel while lying at anchor in a harbor, especially when a gale is coming on, and that the omission to do so is a neglect of duty. But it is also fully proved to have been for a long time the established usage at Provincetown to leave vessels, owned in that place, and manned by persons residing there, at anchor in the harbor without any person on board; and that this usage prevails at all times, whether a gale is coming on or not, and embraces not only fishermen and small craft, but coasters and other vessels there owned; some of them being as large as two hundred tons burthen. Some evidence has been introduced to prove that a similar usage prevails in other places in Massachusetts. But it is to be remarked that all those named, excepting Cape Ann, are tide harbors; and that the testimony comes only from occasional visitors, and not from the residents of any of those places, and is by no means satisfactory as to the generality of the usage, and its extent or limitations, and especially whether it prevails when a gale is foreseen. That it is material that the witnesses should have spoken to this point is apparent from the testimony of witnesses from Truro, which lies on the harbor of Provincetown, by which it appears that, although they adopt the usage of their neighbors in fair weather, yet when a gale is seen to be approaching, some persons are put on board their vessels for greater security. The usage, therefore, which is to cover the present case, is not shown to exist except among the inhabitants of Provincetown.

It is proved that the usage was followed in the present case. Howard, the mate of the Lion, testifies that seeing a gale coming on, he and the captain went on board of her and let go a second anchor and moored her in the usual manner. It has been urged with much force by the counsel for the respondents: 1. That all the ordinary and usual precautions were adopted, and that they were not bound to extraordinary and unusual measures; and 2. That the fact that such usage had been adopted and universally practised upon by the people of Provincetown, known to be prudent, sagacious and economical, is conclusive evidence that it is safe and proper. As to the last point, it may be observed in the first place, that the practice of the people of Truro is evidence on the other hand that it is not safe and proper to leave vessels alone when a gale is foreseen; and in the next place that the usage is not adopted by the people of Provincetown for its safety, or because there is less danger of vessels striking adrift or coming in collision in that than in other harbors,

but for their own convenience, their vessels being generally small and employed in the fisheries, are much in the harbor, and very often with little or no lading on board; and the officers and crew having their families and homes at Provincetown, the convenience of the practice to them outweighs its hazards; and therefore they have been content to adopt it with the mutual understanding that when accidents occur each one shall bear the damage occasioned to his own vessel by drifting or collision. This may be all very well as among themselves, but the question is whether a stranger vessel, not assenting to the usage or participating in its benefits, shall be subjected to its hazards. It is to be borne in mind that this is not a case of contract, where a party having made an agreement with reference to a known usage, thereby assents to and adopts it. The harbor of Provincetown, as part of the great highway, is equally open to all vessels of the United States, and much resorted to as a place of safety by strangers, and oftentimes by those laden with valuable cargoes. The libellant's vessel did not enter it by the indulgence of the people of Provincetown, but used its waters as a matter of right, independent of their consent. When it is said that all the usual and ordinary precautions were adopted, the truth of the proposition depends on the standard to which reference is had. If referred to the practice of the inhabitants of Provincetown it is true, but with reference to the general maritime practice it is not true. The question, then, is whether a person who has adopted the usage of a village of about 2,200 inhabitants in contravention of the practice of all the rest of the maritime world, can be correctly said to have adopted all the usual and ordinary precautions? Is it not apparent that the inhabitants of Provincetown have habitually violated a general rule for safety adopted by mariners? And the defence of the respondents is, that they have only participated in this violation. When the libellant entered the harbor of Provincetown, he was bound only by the general maritime rules and usages, and he had a right to rely upon their observance by others using the same public waters.

It has been further contended that, even if there was negligence in leaving the Lion without any person on board, yet the injury to the Eddington was not occasioned thereby. Now I think that when it is shown that a collision has taken place between two vessels, and that one of them had neglected an ordinary and proper measure of prevention, the burthen at least, is on her to show that the collision was not owing to her neglect, but would have equally happened if she had performed her duty.

This burden the respondents have assumed and insist that such was the extreme darkness of the night and violence of the gale, that human efforts would have been vain,

that no sail could have been set, nor the course of the vessel in any manner changed, and that if it could a vessel could not have been seen far enough to avoid striking her.

I have already stated that after examination and comparison of the mass of conflicting evidence, I am satisfied that upon the water a vessel could have been seen at some distance, and far enough to be avoided by any vessel which could be sheered. As to the possibility of changing the course of the vessel, opposite opinions have been strongly expressed by different witnesses; but I am relieved from the necessity of settling the pretensions of conflicting theories, by the fact that some vessels were sheered so as to avoid others.

I refer particularly to the testimony of Joseph Barnes, who was master of the Panther, who states that his vessel went ashore when the gale was the heaviest; that several vessels lay to leeward of his; he slipped his cable and "run through the fleet before the wind;" that he had a jib set, "sheered through the other vessels very well, passed several, and run ashore safe." And Martin Stoddard, master of the Gentile, who, after stating that he slipped his cable and hoisted the jib up, proceeds to say: "Our vessel swung off before the wind. I took the helm with one other man and steered her ashore by sheering one way and another to clear her of vessels. When we hoisted the jib up it burst, but it held until we swung off before the wind." Charles Bruce, master of the Amanda, testifies that he sheered his vessel; and to this we may add the success of Jefferson in disengaging the Lion from the Tarquin. These are pregnant facts, and they stand wholly uncontroverted. There is no evidence that any one attempted to sheer his vessel without some success.

Upon the best consideration which I have been able to bestow upon this case, I am of opinion that the defence is not sustained, and that the decree must be in favor of the libellant.

It has been stated that a decision adverse to the local usage which has been relied upon will subject the people of Provincetown to great inconvenience. If so, it is a consequence much to be regretted, but cannot vary the duty of the court.