## THE COMET.

(District Court, S. D. New York. May 11, 1900.)

Collision—Vessel Drifting from Anchorage.

The schooner yacht Comet, 62 tons and length 80 feet, was anchored in her usual grounds during a night in summer, when a sudden and severe squall came up, the wind blowing for 15 minutes at from 40 to 60 miles an hour. Six men were on board below, and at once came up and dropped a second anchor, the two weighing 400 and 600 pounds, respectively. The anchors dragged for a distance, and then held; but subsequently again dragged, and the vessel drifted against a pier, and in doing so injured another yacht, which had just previously drifted to the pier and had been made fast. *Held*, that the injury was due to a peril of the sea, and not to any failure in the use of reasonable nautical skill, or to insufficient anchors or the selection of improper anchorage grounds, the Comet having anchored on the same grounds, using the same anchors, for 20 years previously, without mishap; nor could she be charged with fault, under the circumstances, in failing to keep an anchor watch, which was not customary on such vessels, and would not have changed the result.

In Admiralty. Suit for collision.

George H. Bruce and Philip Carpenter, for libelant.

Pryor & Truax, for claimant.

BROWN, District Judge. A little after 1 o'clock in the morning of June 29, 1899, the sloop yacht Thorn of about 8 tons, and 51 feet long, and the schooner yacht Comet of 62 tons' burden, and about 80 feet long, were both driven from their usual anchorage grounds off Bay Ridge in a sudden squall, and dragging their anchors brought up against the long pier at the foot of Sixty-Fifth street, Brooklyn. The Thorn reached the pier first, and was there made fast alongside without much damage. A few minutes afterwards the Comet was carried past her; but her main boom projected considerably beyond her stern and raked across the deck of the Thorn and carried away a portion of the Thorn's cabin, broke her mast, and did some other damage, for which the above libel was filed. The Comet brought up a little inside of the Thorn, her overhanging stern running up over the pier and a part of her hull resting upon a float belonging to a club boat house near the pier.

Upon the whole testimony I think the accident should be classed with perils of the sea, as properly attributable to the sudden and extraordinary violence of the squall, and not to any failure in the use of reasonable nautical skill and prudence, or of insufficient anchors, or the selection of improper anchorage ground.

The anchorage had been a usual and customary place for anchoring

for a long time; the Comet had been anchored in about the same position by ranges for some 20 years previous; her two anchors were of about 400 and 600 pounds each, and she had never dragged from her anchorage there before. Her position was about a quarter of a mile off shore, that is, about 700 feet outside of the Sixty-Fifth street pier, which was itself about 700 feet long; and she was about 300 or 400 feet to the northward of that pier. The Thorn had come in not long before the squall and had anchored a little inside of the Comet. It was a mild summer night, the wind was light until two minutes past 1 a. m., when the squall came on from the northwest or north northwest, blowing for five minutes at the rate of 66 miles per hour; during the next five minutes, 56 miles per hour; during the next five minutes, 40 miles; and for some time afterwards at the rate of 30 miles per hour. Six men were on board the Comet and all were below when the squall came on with rain, without previous warning. The quarter master immediately came on deck and the second anchor was thrown out. After dragging so as to be about on a line with the end of the Sixty-Fifth street pier, the anchors held for a few minutes, during which time the Thorn drifted past, dragging her anchors on the port side of the Comet, but too far away to send her a line which was called for. Soon afterwards the Comet again dragged and touched the pier, first outside of the Thorn, and afterwards raked across her with her boom, as above stated. The watchman at the dock and the man in charge of the boat house say that the Comet came in from five to seven minutes after the Thorn. From this testimony it is probable that the Comet's first dragging was during the first few minutes of the squall, and that her anchors then held her for not more than from five to seven minutes. Her men say, that as the violence abated, the wind continued puffy; so that her anchors were probably again loosened by the gusts in the natural rising of the waves.

Complaint is made that the Comet should have had an anchor watch; but the evidence is that an anchor watch is not customary upon yachts in that region. It was not a place where other vessels were to be expected; and the likelihood of any such violent storm as to cause dragging (which had not happened to the Comet there in 20 years) was so small in the summer season, that I cannot find that the maintenance of an anchor watch was obligatory, having reference merely to so improbable a contingency as this. It is evident, moreover, that an anchor watch would not have avoided dragging. The approach of a thunder shower at night, even if it could have been perceived by a watch, would not have excited apprehension or caused any additional anchor to be cast over until the squall had come and shown that another anchor was necessary. In fact the squall came on with almost instantaneous suddenness, and the men came up at once; so that the second anchor was thrown out within a minute or two as early as it could have been thrown if an anchor watch had been on deck. Evidently this would have made no difference in the result.

It is also urged that the yacht might have made sail and crawled off after the wind had abated somewhat. The weight of expert evi-

dence on this head is altogether against this contention. I have no doubt that the Comet reached the Thorn within the first 15 minutes of the squall, during which time the wind ranged from 66 miles to 40 miles per hour; and in such a wind I am satisfied that nothing useful could have been accomplished by any attempted use of the sails. The weight of testimony is that had any such attempt been made, it would have resulted in carrying the Comet ashore more quickly, and that the only reliance was upon the anchors, and on paying out the chain. This was done. When the Comet's anchors first held near the line of the pier, it was reasonable to suppose that they would continue to hold; and considering the small space available, and the very high gale, then from 40 to 56 miles per hour, it would seem to me a very foolish act to touch the sails while the anchors held, and that raising them after she began to drift again would have been useless and would have sent her ashore the more quickly.

The proof on these points on the part of the libelant, is especially defective in two respects: First, in the absence of any expert skilled in the use of yachts; and, second, the failure to call the master of the Thorn, the only man on board her, though during part of the trial he was in court. He especially was presumptively best acquainted with all the circumstances of the occasion, and should have been the first person to point out any negligence in the management of the Comet, if there was any. On the part of the claimant, on the other hand, the evidence of the best experts is that the anchors were reasonably sufficient and that there was no mismanagement of the boat. The proof shows that the anchors did not foul, and that the dragging was purely from the violence of the wind.

The cases cited by the libelant of The Mary E. Cuff (D. C.) 84 Fed. 719, and The Eloina, 10 Ben. 458, Fed. Cas. No. 4,420, and The Martha Davis (D. C.) 94 Fed. 559, are plainly inapplicable, as in those cases no second anchor was thrown out; while in the first above case and also in Clapp v. Young, 1 Sprague, 40, Fed. Cas. No. 2,786, no person was left on board.

Libel dismissed, but without costs.